**No. 22-1290**

_____

**UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT**

_____

**NICOLE BRONSON,**

    *Plaintiff-Appellant,*

    *v.*

**ANN & ROBERT H. LURIE CHILDREN'S
HOSPITAL OF CHICAGO and SUSAN
RUOHONEN.**

_____

**Appeal From the United States District Court
For the Northern District of Illinois
Eastern Division
Case No. 20-Civ-2077
Honorable John Z. Lee**

_____

**CORRECTED BRIEF AND SHORT APPENDIX OF
PLAINTIFF-APPELLANT**

_____

Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001
*Attorney for Plaintiff-Appellant*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: _____22-1290_____

Short Caption: _____BRONSON vs ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL, et al _____

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[ ]     PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
        NICOLE M. BRONSON _____

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
        CALVITA J. FREDERICK& ASSOCIATES _____

(3)     If the party, amicus or intervenor is a corporation:

        i)      Identify all its parent corporations, if any; and
                N/A _____

        ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
                N/A _____

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

        N/A _____

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

        N/A _____

Attorney's Signature: _/S/ Calvita J. Frederick_____ Date: __March 24, 2022_____

Attorney's Printed Name: _____Calvita J. Frederick_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes _X____     No _____**

Address: _____Post Office Box 802976_____

_____Chicago, IL.  60680_____

Phone Number: __(312) 421-5544_____     Fax Number: _____(312) 277-7190_____

E-Mail Address: __cjf@cjfredericklaw.com___Calvita.frederick@att.net_____

rev. 12/19 AK

# TABLE OF CONTENTS

**JURISDICTIONAL STATEMENT**……………………………………………….....1

**ISSUES PRESENTED FOR REVIEW**……………………………………………1

**STATEMENT OF THE CASE**……………………………………………………1

**SUMMARY OF THE ARGUMENT**………………………………………………...5

**ARGUMENT**……………………………………………………………………..7

**Standard of Review**………………………………………………………….....7

I.    The Trial Court Erred in Finding, on a Motion to Dismiss, That Lurie Hospital Was Not Plaintiff's *De Facto* or Joint Employer…………………………..……7

    A.  The District Court Erred in Applying the General Control Test…………….8

    B.  The District Court Erred in Failing to Apply the Specific Control Test …...13

II.    The District Court Erred in Dismissing Ms. Bronson's Section 1981 Claims….15

**CONCLUSION**…………………………………………………………………...16

# TABLE OF AUTHORITIES

## Cases

**Page(s)**

*Alexander v. Rush N. Shore Med. Ctr.*,
  101 F.3d 487 (7th Cir. 1996) ........................................................................ 10

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................
*passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................ 8

*Brown v. Cook Cty., No. 17 C 8085, 2018 U.S. Dist. LEXIS 106746*
  (N.D. Ill. June 26 2018) ........................................................................ 9

*Downey v. R.W. Briscoe & Assoc., Inc.* ,
  No. 09 C 5870, 2012 U.S. Dist. LEXIS 133596 (N.D. Ill. Sept. 18, 2012) ................... 16

*Frey v. Hotel Coleman*,
  903 F.3d 671 (7th Cir. 2018) ........................................................................ 14

*Harris v. Allen Cnty. Bd. of Comm'rs*,
  890 F.3d 680 (7th Cir. 2018) ........................................................................ 9

*Heinemeier v. Chemetco, Inc.*,
  246 F.3d 1078 (7th Cir. 2001) ........................................................................ 15

*Knight v. United Farm Bureau Mut. Ins. Co.*,
  950 F.2d 377 (7th Cir. 1991) ........................................................................ 5

*Leone v. Naperville Professionals, Inc.*,
  No. 14 C 9583, 2015 U.S. Dist. LEXIS 50716 (N.D. Ill. Apr. 17, 2015) ....................... 10

*Love v. JP Cullen & Sons, Inc.* ,
  779 F.3d 697 (7th Cir. 2015) ........................................................................ 8,9,10

*McReynolds v. Merrill Lynch & Co.* ,
  694 F.3d 873 (7th Cir. 2012) ........................................................................ 8

*Nischan v. Stratosphere Quality, L.L.C.*,
  865 F.3d 922 (7th Cir. 2017) ........................................................................ 9

*Papa v. Katy Indus.*,
  166 F.3d 937 (7th Cir. 1999) ........................................................................ 14

*Penteris v. Citgo Petrol. Corp.*,
    104 F. Supp. 3d 894 (N.D. Ill. 2015) ............................................................ 10

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) .................................................................... 14

*Tritsis v. BankFinancial Corp.*,
    No. 16 C 02052, 2016 U.S. Dist. LEXIS 129146 (N.D. Ill. Sept. 21, 2016) ................ 15

*Worth v. Tyer*,
    276 F.3d 249 (7th Cir. 2001) ...................................................................... 13

**Statutes**

28 U.S.C. § 1291 ......................................................................................... 2
28 U.S.C. § 1331 ......................................................................................... 2
28 U.S.C. § 1981 ..................................................................................... 2,3,4
42 U.S.C. § 1981 ...........................................................................................
*passim*

## JURISDICTIONAL STATEMENT

This appeal arises from a complaint alleging race discrimination in violation of Title VII and 42 U.S.C. § 1981, as well as various state laws.  The District Court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.  On March 18, 2021, that court granted a motion to dismiss the complaint. Special Appendix ("SA") 1. On April 14, 2021, Plaintiff-Appellant filed a timely motion for reconsideration.  On January 25, 2022, the District Court denied the motion for reconsideration.  SA 2. On February 23, 2022, Plaintiff-Appellant filed a timely Notice of Appeal. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in finding, as a matter of law, that a hospital that oversaw the day-to-day tasks of a teacher, provided that teacher training, a badge, phone, email, and office space, was not the teacher's employer for purposes of Title VII.

2. Whether the District Court erred in dismissing Plaintiff-Appellant's Section 1981 claims despite her having pled that her immediate supervisor created a hostile work environment.

## STATEMENT OF CASE

### A.  The Complaint

On August 31, 2018, Plaintiff-Appellant, Nicole Bronson ("Ms. Bronson"), a Black woman, was hired by Tora Evans as a teacher in the Chicago Public Schools ("CPS") and received a three-year assignment to teach student/patients at Defendant Lurie Hospital. App 2, Compl. ¶ 9.

In that position, Ms. Bronson was virtually indistinguishable from any other Lurie Hospital employee: she was required to go through Lurie Hospital employee training, carry a Lurie Hospital identification badge, perform her job duties and operate through the Lurie Hospital email system, and carry a Lurie Hospital pager. App 3, Compl. ¶ 10.  Her day-to-day activities were supervised by Lurie Hospital's Senior Director of Family Services, Defendant Susan Ruohonen ("Ms. Ruohonen"). App 3, Compl. ¶ 11.

Ms. Branson's job at Lurie Hospital was to oversee eligibility procedures and instruction resources for students who were unable to access classroom instruction as a result of being diagnosed with medical or psychiatric conditions.  She was also entrusted with providing bedside instruction to patients. App 3, Compl. ¶ 12.

Unfortunately, Lurie Hospital proved a toxic environment for its Black staff, and the Black teachers, in particular.  Ms. Bronson and her co-worker, Catherine Cooper, were the first Black teachers to perform this work at Lurie Hospital. App 3, Compl. ¶¶ 14-15.  From the very first day, Ms. Ruohonen treated Ms. Bronson and Ms. Cooper differently from their white counterparts. Among other things, her Ms. Ruohonen denied Ms. Bronson and Cooper access to the Lurie Hospital EPIC System – a database that teachers must be able to access to perform their job – while granting their white counterparts untrammeled access. App 4, Compl. ¶¶ 18-20. When Ms. Bronson complained that she could not do her job without EPIC access (*e.g.,* could not obtain parental consent or coordinate her teaching plans), Ms. Ruohonen incorrectly claimed that there was a "new policy" that prevent any teacher from receiving EPIC access.  *Id.*

In the ensuring months, Ms. Ruohonen began to ratchet up the pressure on Ms. Bronson and Cooper: she ostracized them internally by refusing to meet with them, refused to respond to their inquiries, and sent baseless, critical emails about Ms. Bronson and Ms. Cooper to their

supervisors in CPS.  *Id.* ¶¶ 21-28. These emails prompted Ms. Bronson to reach out to her

representative in the Chicago Teacher's Union ("CTU"), who wrote a stinging email to Ms.

Ruohonen accusing her of overstepping her bounds.  App 6, Compl. ¶ ¶ 29.  Among other

things, the representative asserted that only a CTU representative could initiate disciplinary

action against a CTU member for violating Chicago Board of Education policies.  *Id.*

Shortly thereafter, Ms. Ruohonen was removed as Ms. Branson's "representative

supervisor." *Id.*  However, she continued her campaign of harassment against Ms. Branson.  She

encouraged a nurse who followed Ms. Bronson into the patient/student room and asked, in front

of the patient/student and her grandmother, whether Ms. Bronson "could read." App 8, Compl. ¶

33. She falsely stated to a CPS director that a parent had issued a complaint against Ms. Bronson.

App 8-9, Compl. ¶ 34. Then, in May 2019, Ms. Ruohonen announced that CPS Teachers like

Plaintiff would no longer have dedicated office space. App 9, Compl. ¶ 39.  Ms. Evans attempted

to intervene to ensure Ms. Bronson had adequate space, but was unsuccessful. App 10, Compl.

¶¶ 41-45. A few months later, Ms. Ruohonen signaled that she was compiling an email charging

Ms. Bronson with multiple, baseless HIPPA violations. App 11-12, Compl. ¶ 48.

Ms. Ruohonen's harassment took a profound toll on Ms. Branson's mental and physical

health: her blood pressure rose to dangerous levels and she began experience tightness in her

chest.  App 13, Compl. ¶¶ 50-52.  Unable to withstand the harassment any longer, in December

2019, she filed a charge of discrimination with the Illinois Department of Human Rights and the

EEOC against Lurie Hospital.  On December 30, 2019, the EEOC issued a Notice of Right to

Sue Letter.

**B.  Proceedings Below**

On March 31, 2020, she filed a complaint in federal court alleging violations of Title VII, 42 U.S.C. § 1981, and several state law claims. Defendants Lurie Hospital and Ms. Ruohonen (collectively, "Defendants-Appellees") moved to dismiss the Title VII claims on the grounds that they were not Ms. Bronson's employer, and the Section 1981 claims on the grounds that the complaint did not allege an adverse action and that Ms. Bronson's claims were preempted by the Collective Bargaining Agreement between CPS and CTU.

On March 18, 2021, the District Court dismissed the complaint in its entirety without leave to amend.   As to the Title VII claims, the court applied the factors outlined in *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377 (7th Cir. 1991) and concluded that Defendants were neither her direct nor indirect (or *de facto*) employer, and therefore could not be sued. According to the court, Ms. Bronson not only failed to plead any facts indicating that Defendants had the ability to hire, fire, or direct her work, she actually "concede[d]" that CPS alone carried those responsibilities. SA 9.   In reaching that conclusion, the court relied on an email from Ms. Bronson's Union representative, who informed Ms. Ruohonen that her "feedback" was not "received well." *Id.* (quoting Compl. ¶ 29). The court also found that the Complaint inaccurately characterized Ms. Ruohonen as Ms. Bronson's "immediate supervisor," SA10, and concluded that the CTU's ability to remove her as a supervisor showed that Defendants lacked "meaningful supervision or control over Bronson." SA 10.

The court also found that Ms. Evan's lobbying to ensure that Ms. Bronson had adequate working space at Lurie Hospital showed that CPS exercised real control over her working conditions, and that Ms. Ruohonen's refusal to give Ms. Bronson EPIC access only "underscores the extent to which she was not treated like a hospital employee." SA 10.   Finally, the court found that Ms. Bronson failed to allege that "Lurie helped her to acquire skills for the job, that

Lurie was responsible for any of the costs of operation, or that Lurie had anything to do with the method or form of her payments or benefits." SA 10-11.

As for the Section 1981 claims, the court found that Ms. Bronson had failed to plead that the discrimination interfered with her right to make or enforce contracts. SA 11.  The court interpreted the Section 1981 claim as being predicated on the allegation that Defendants "interfered with her right to adequate workspace under the terms of the CBA between CPS and CTU.  SA 12.  Construing this as a "third party interference" claim, the court applied Illinois law and found that the Complaint had failed to make the requisite showing that "Defendants induced a party to the CBA – namely CPS – to breach the provision entitling Bronson to adequate workspace." SA 13.

## SUMMARY OF THE ARGUMENT

The District Court's Opinion is riddled with errors: it misapplied the law on *de facto* employment, blatantly misconstrued allegations in the complaint (and ignored others), and ignored its obligation on a motion to dismiss to treat the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.

It is well-established that a plaintiff may have multiple employers for purposes of Title VII.  When assessing whether a party qualifies as an employer, the courts can employ two tests: the general control and the specific control test.  The former uses a five-factor test to assess an entity's general level of control over the plaintiff; the latter asks whether the entity had enough control to direct the specific discriminatory acts.  The District Court misapplied the first test and completely failed to apply the second.

The Complaint pled more than sufficient facts to establish general control at the motion to dismiss stage.  Among other things, it pled that Ms. Ruohonen was an "immediate

supervisor," that she was controlled Ms. Bronson's access to the instrumentalities (*e.g.,* the EPIC system) that were necessary to perform her job; it pled that Ms. Bronson wore a Lurie Hospital badge, used a hospital email and phone, taught on the hospital premises, used office space supplied by Lurie, and received Lurie employee training.  The District Court was obligated to treat these allegations as true. Instead, it either outright ignored the allegations (as was the case with the allegations concerning employee training, the badge, email, and phone); or simply refused to believe them.  Instead of believing Ms. Bronson's allegations, the Court treated as true the views of Ms. Bronson's *Union representative*, whose advocacy email on Ms. Bronson's behalf was merely quoted in the Complaint.  A court does not have leeway on a motion to dismiss to prioritize the opinions of someone *quoted* in a complaint over the actual, well-pled allegations in that complaint.

The District Court's error as to the specific control test is even more glaring – namely, because it never bothered to apply the test at all.  The Complaint pled that Defendants had control over the aspects of Ms. Bronson's employment where the discrimination occurred: they controlled EPIC and they blocked her access; they controlled the office space, which they denied her.

Here, there is no question that the discriminatory practices were initiated by supervisors at Lurie Hospital. In fact, to the extent that CTU/CPS were involved at all, it was in an attempt to remediate that discriminatory conduct.  Herein lies the most perverse consequence of the opinion below: the wrongfulness of Defendants' conduct is not in dispute here, but if only CTU/CPS are considered employers for purposes of federal civil rights law, then Ms. Bronson will have *no recourse* for the wrongs that she suffered.

The District Court's treatment of the Section 1981 claim is equally flawed. First, it based its conclusion on rank speculation about the effect of the CBA – something which was neither referenced in the complaint nor attached to the papers below. Second, it acted as though this claim were based exclusively on Defendant's failure to provide adequate office space when, in fact, the Complaint explicitly pleads a Section 1981 claim based on the creation of a hostile work environment.

Ultimately, the questions that this lawsuit raises – whether there was an employer/employee relationship and whether the Defendants were responsible for creating a hostile work environment in violation of Title VII and Section 1981 – are highly fact intensive. Ms. Bronson has done all that is required of her at the pleading stage; she is entitled to discovery to prove each of these claims.

Accordingly, the decision below should be reversed.

## ARGUMENT

### Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations are accepted as true at the pleading stage, but "allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co., Inc*., 694 F.3d 873, 885 (7th Cir. 2012).

**I.  The Trial Court Erred in Finding, on a Motion to Dismiss, That Lurie Hospital Was Not Plaintiff's *De Facto* or Joint Employer**

It is well-established that "a plaintiff may have multiple employers for the purpose of Title VII liability." *Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 701 (7th Cir. 2015). It is equally well-established "a plaintiff can, under certain limited circumstances, bring a claim against a defendant who is not his direct employer," by showing that the defendant is the *de facto* or joint employer. *Id*.

In this Circuit, a plaintiff may show *de facto* employment in one of two ways: either by showing that the defendant "generally controlled his employment," or by showing that "it controlled those specific aspects of his employment related to the subject of his suit." *Harris v. Allen Cty. Bd. of Comm'rs*, 890 F.3d 680, 686 (7th Cir. 2018) (internal citations omitted).

The District Court committed manifold errors below.  First, it incorrectly and prematurely analyzed the "general control" test factors, despite the consensus that this test must await discovery. Second, it failed to apply the "specific control" test at all.

### A.  The District Court Erred in Applying the General Control Test

In determining whether a party is a *de facto* or joint employer, the court must examine the following so-called *Knight* factors:

> (1) extent of the [purported] employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the work-place, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, work-place, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 929 (7th Cir. 2017) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir. 1991)).

Because the *Knight* factors are highly fact-intensive, the issue of whether a party is a *de facto* or joint employer can rarely be addressed at the motion to dismiss stage.  *See, e.g., Brown v. Cook Cty.,* No. 17 C 8085, 2018 U.S. Dist. LEXIS 106746, at *24-25 (N.D. Ill. June 26, 2018)

(the *de facto* employer inquiry "is difficult to do this without a more fully developed factual record, which is probably why, in so many of the cases cited by both parties, such issues were determined at the summary judgment stage rather than on a motion to dismiss") (citing cases); *Leone v. Naperville Professionals, Inc*., No. 14 C 9583, 2015 U.S. Dist. LEXIS 50716, at *12 (N.D. Ill. Apr. 17, 2015) (noting that the defendant "has not cited a single case resolving the existence of an employer-employee relationship at the motion to dismiss stage."); *Penteris v. Citgo Petroleum Corp.*, 104 F.Supp.3d 894, 900 (N.D. Ill. 2015) ("Determining whether an entity is a joint employer is a fact-intensive inquiry that typically requires further development through discovery").

Not only did the District Court evaluate the *Knight* factors without the benefit of discovery, it did so in a manner that blatantly violated its obligation at the motion to dismiss stage to accept all well-pled allegations in the complaint as true and draw all reasonable inference in the Plaintiff's favor.

i.    <u>First Factor</u>

The first factor – "control and supervision" – is the "'most important' consideration in ascertaining the existence of an employer-employee relationship."  *Love*, 779 F.3d at 703. "[I]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Alexander v. Rush N. Shore Med. Ctr*., 101 F.3d 487, 493 (7th Cir. 1996) (internal quotation marks omitted).  The Complaint pled facts sufficient to give rise to an inference of control and supervision at the motion to dismiss stage. Specifically, Ms. Bronson alleged that she conducted all of her teaching on-site at Lurie Hospital, under the immediate supervision of Ms. Ruohonen; App 3, Compl. ¶ 11; that Ms. Ruohonen controlled her ability to

access the EPIC system, which was critical to her ability to perform her job functions, *id.* ¶¶ 18-21; and that she even dictated the location in the hospital where Plaintiff did her work. *Id.* ¶ 39.

In rejecting the adequacy of these allegations, the District Court impermissibly drew every possible inference *against* Plaintiff. First, it held that the Complaint "concede[d]" that "CPS. . . assigned her to a three-year stint at Lurie, and CPS alone . . . could fire or even discipline her." SA 9 (citing Complaint ¶¶ 9, 29). But the two paragraphs of the Complaint say no such thing. Paragraph 9 states: "On August 31, 2018, Bronson was hired by Ms. Tora Evans ("Tora") Manager as a Citywide Hospital and Treatment Center Teacher ("the Position") and Plaintiff received a three-year assignment to Lurie Hospital which assigned ends in 2021." This paragraph identifies who hired Plaintiff but it does not reveal who assigned her to Lurie Hospital, nor does it remotely foreclose the possibility that Lurie Hospital vetted her or had input in the assignment.

The District Court relied even more heavily on paragraph 29 of the Complaint. But the notion that this paragraph contains any "concessions" is severely misplaced. As an initial matter, the court completely misread this email quoted in paragraph 29. In that email, Ms. Bronson's Union representative asserted that Ms. Ruohonen had no right to discipline a CPS teacher for "an infraction of *[Chicago] Board [of Education]* policies or rules." App 6, Compl. ¶ 29 (emphasis added). That email says nothing about Ms. Ruohonen's ability to evaluate or discipline Plaintiff for violations of *Lurie Hospital policies or rules*.

More importantly, however, paragraph 29 does not express *Ms. Bronson's view* about the scope of Ms. Ruohonen's powers over her. Rather, that paragraph simply quotes the position of the *Union representative* who was aggressively advocating on Ms. Bronson's behalf. In fact, the representative's view that Ms. Ruohonen overstepped her authority under the CBA is precisely

the sort of conclusory statement that is not typically credited at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678. It is all the more shocking, then, that the District Court would treat the representative's opinion as a binding concessions that trumps the actual allegations in the complaint. Neither the CBA that the Union representative relied on, nor the contract between Lurie Hospital and CPS/CTU were ever before the District Court. Thus, whether the representative accurately summarized Ms. Ruohonen's powers vis-à-vis Ms. Bronson is impossible to determine without further discovery. Whatever the outcome of discovery, the District Court was obligated at this juncture to draw the inference in favor of Ms. Bronson.

     ii.    <u>Second Factor</u>

The second *Knight* factor – the skills "required" and "obtained in the work-place" – also cuts in Ms. Bronson's favor, particularly at the pleading stage.[1] The Complaint alleges that Ms. Bronson had to go through Lurie Hospital employee training, App 3, 5, Compl. ¶¶ 10, 22, including a special HIPPA training to make sure that they did not misuse the confidential information contained in the EPIC system. App 9, Compl. ¶ 35. Tellingly, the District Court did not explain this away – rather, it ignored these allegations entirely.

     iii.    <u>Third Factor</u>

As for the third *Knight* factor, the Complaint alleged that Ms. Bronson conducted all of her work at Lurie Hospital, where she was required to carry a Lurie Hospital identification badge, and use a Lurie Hospital email system and pager, App 3, Compl. ¶ 10; that Defendants

---

[1] This factor further underscores the prematurity of the District Court's conclusion. To thoroughly evaluate this factor, a court must assess on summary judgment (1) the extent and scope of the training; and (2) whether the skills acquired during the training were readily transferable to any other job. *See Love v. JP Cullen & Sons, Inc*., 779 F.3d 697, 704 (7th Cir. 2015). Here, however, no discovery had been undertaken on these issues – accordingly, it is impossible to conduct the sort of detailed, factual analysis required to definitively state which way this factor cuts.

controlled the EPIC system that Ms. Bronson relied on to do her job, *id*; that they provided the class rooms in which she taught her classes, App 8, Compl. ¶ 33; that Defendants furnished and controlled the office space from which she worked, App 9-10, Compl. ¶¶ 39-40; and that Defendants provided her work phone. App 10-11, Compl. ¶ 45. *See  Worth v. Tyer*, 276 F.3d 249, 264 (7th Cir. 2001) ("an entity bears costs of operation – such as for equipment or office space – an employee/employer relationship is more likely.").

The District Court ignored most of these allegations, focusing instead on the inadequacy of two: the control over the workspace and the control over EPIC.  But in evaluating these two allegations, the District Court once again drew every possible inference in *Defendants'* favor.  It held that an email from a Union representative chastising Defendants for not providing "adequate and appropriate" workspace shows that Defendant's control was "minimized by [CTU] oversight." Opinion 10.  But the power to admonish does not equate to control. Under the District Court's strained logic, an employer could argue that an EEOC missive warning the employer not to discriminate against its minority workers would show that the EEOC, not the employer, exercised true control over the terms and conditions of the employment.

As for the EPIC issue, the District Court found that the fact "that [Plaintiff] was denied access under the hospital's new HIPAA policy underscores the extent to which she was not treated like a hospital employee." Opinion 10.  This finding is simply incredible.  The entire thrust of the Complaint is that Ms. Bronson was denied access on account of her race, not because the hospital regarded as a non-employee.  The opinion below flips that narrative on its head, implicitly exonerating the hospital of accusations of discrimination and then justifying the denial of access by speculating that the real reason was that Lurie Hospital did not regard Ms. Bronson as an employee.

iv.     Fifth Factor

As for the fifth *Knight* factor, the law is clear that a court cannot ascertain the "job expectations" without examining the contract itself. *See, e.g., Shaw v. Am. Income Life Ins. Co.*, No. 1:11-CV-123, 2012 U.S. Dist. LEXIS 14426, at *36 (N.D. Ind. Feb. 7, 2012) (courts must "look at the contract's language [including its termination provision] to determine the parties' intent and expectations") (citing cases).  Here, however, the contract was not appended to the complaint and no discovery was undertaken, thus further illustrating why the District Court was in no position to decide the *de facto* employment question at the motion to dismiss stage.

Indeed, the only factual averment relating to this factor – namely, the fact that Ms. Bronson agreed to a three-year term with Lurie Hospital – tilts in favor of finding an employer/employee relationship. *See, e.g., Frey v. Hotel Coleman*, 903 F.3d 671, 680 (7th Cir. 2018) (finding employee/employer relationship where plaintiff worked for defendant for two years).

v.     Fourth Factor

The only factor that does not cut in Ms. Bronson's favor is the fourth one – the "method and form of payment and benefits."  But it is also well-established "a plaintiff can survive summary judgment even when not all factors support him." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 705 (7th Cir. 2015) (citing cases). That statement is doubly true on a motion to dismiss.  On balance, the preponderance of these factors supports the conclusion that Lurie Hospital was a *de facto* employer.

**B.  The District Court Erred in Failing to Apply the Specific Control Test**

This Court has repeatedly held that an entity other than the direct employer "may be considered an employer under Title VII . . .  if the [entity] 'directed the discriminatory act,

practice, or policy of which the employee is complaining.'" *Tamayo v. Blagojevich*, 526 F.3d 1074, 1088 (7th Cir. 2008) (quoting *Worth v. Tyer*, 276 F.3d 249, 259 (7th Cir. 2001)); *see also Papa v. Katy Indus., Inc*., 166 F.3d 937, 941 (7th Cir. 1999) (looking to whether the parent corporation had "directed the discriminatory act").

The key question in these cases is whether the defendant had control over the specific area of employment in which the discrimination occurred.  Thus, in *Tamayo*, this Court held that a defendant that "controlled [the plaintiff's] salary" was an employer for Title VII purposes because "the basis of her alleged adverse employment action" was unequal pay.  526. F.3d at 1089. This Court reached a similar conclusion in *Heinemeier v. Chemetco, Inc*., 246 F.3d 1078, 1080 (7th Cir. 2001), finding that even though a different entity controlled all other aspects of the plaintiff's employment, the defendant company could be considered her employer for a Title VII unequal pay claim because the plaintiff submitted evidence that the company determined her salary.  *Id.* at 1082-83. *See also Tritsis v. BankFinancial Corp*., No. 16 C 02052, 2016 U.S. Dist. LEXIS 129146, at *5 (N.D. Ill. Sep. 21, 2016) (finding employer-employee relationship where the discriminatory conduct was refusing to award stock options, something over which the defendant had complete control).

Here, the Complaint alleges three strands of discriminatory conduct – denial of EPIC access, displays of personal animosity, and refusal to provide adequate work space – all of which were directed exclusively by Defendants.  The fact that CPS/CTU repeatedly advocated on Ms. Bronson's behalf but were unable to secure Plaintiff's access to the EPIC system or office space, or end Ms. Ruohonen campaign of harassment, only further underscores that Defendants had complete control over the direction of the discriminatory conduct.

14

Again these facts, the District Court's finding that Lurie Hospital was not an employer because it did not have the power to "hire or fire" Plaintiff makes little sense. The power to "hire and fire" is obviously relevant where the plaintiff's claim is predicated on a discriminatory decision to fire or not hire; its relevance is less obvious where a plaintiff alleges a discriminatory failure to approve vacation time. For such a claim, the key question would be: who controls PTO policy?

This principle has been recognized time and time again. Thus, the District Court relied on *EEOC v. State of Illinois,* 69 F.3d 167 (7th Cir. 1995), to suggest that the power to hire and fire an individual is the "key" power in the employment relationship. But, as another court has explained, *EEOC* emphasized the right to "hire and fire" because the claim in that case involved "discrimination in hiring and firing." *Downey v. R.W. Briscoe & Assoc., Inc.*, No. 09 C 5870, 2012 U.S. Dist. LEXIS 133596, at *11 (N.D. Ill. Sep. 18, 2012). The real question is whether the defendant had control over the "alleged adverse employment action." *Id.*

Accordingly, this Court should reverse the decision below and instruct that Ms. Bronson need only prove that Defendants controlled and directed the discriminatory actions against her.

II.     **The District Court Erred in Dismissing Ms. Bronson's Section 1981 Claims**

The District Court found that Ms. Bronson had not stated a claim under 42 U.S.C. § 1981 because she failed to plead that the Defendants had "tortiously interfered with her contractual right to adequate workspace under the CBA." SA 13. That conclusion is a non-sequitur, based on stunningly cramped reading of Section 1981.

The District Court somehow assumed that because the subject matter of Section 1981 is the right to "make and enforce contracts," that Ms. Bronson needed to plead that Defendants tortiously interfered with her contract with *CPS/CTU* under the CBA to state a claim. There are

two problems with this.  First, the District Court impermissibly assumed that the only contractual relationship was between Ms. Bronson and CPS/CTU.  Put differently, it assumed, without any basis in the pleadings, that Ms. Bronson worked in Lurie Hospital for multiple years, wore a Lurie Hospital badge, received Lurie Hospital training, and used its office space, phone, and email, without signing any sort of contractual papers with the hospital.[2]  Needless to say, hospital HR departments do not generally allow individuals – even those on secondment – to roam their halls, use their resources, and interact with their patients without first requiring that some paperwork be signed. Ms. Bronson is at least entitled to discovery to show that a contractual relationship cognizable under Section 1981 existed between her and Defendants.

Second, the District Court's fixation on the tortious interference angle ignored Ms. Bronson's hostile work environment claim.  It is well-established that a plaintiff may plead a hostile work environment claim under Section 1981 by showing that her work supervisor discriminated against her on the basis of race. *See Sauceda v. Cent. Pool Supply, Inc.*, No. 4:14-cv-04053-SLD-JEH, 2017 U.S. Dist. LEXIS 46922, at *13 (C.D. Ill. Mar. 30, 2017) (citing cases).  The District Court implicitly acknowledged that the actions of Ms. Ruohonen created a hostile work environment.  But it apparently deemed these actions insignificant because CTU/CPS intervened in an attempt to remedy the discrimination. However, the fact that CTU/CPS might have lobbied on Ms. Bronson's behalf and attempted to blunt the effects of Ms.

---

[2] Of course, Section 1981 broadly prohibits racial discrimination that interferes with the "enjoyment of the benefits of a contractual relationship or the conditions of that contractual relationship." *Patel v. Bd. of Governors of State Colls. & Univs.*, Case No. 92 C 8300, 1997 U.S. Dist. LEXIS 10221, at *8-9 (N.D. Ill. July 8, 1997) (citing 42 U.S.C. § 1981 (a)(b)).  Thus, Plaintiff has also stated a viable claim by alleging that Defendants deprived her of the benefits that were contained in the CBA – including, *inter alia,* the right to adequate working space.

Ruohonen's discriminatory actions has zero bearing on whether *Ms. Ruohonen* can be held liable

under Section 1981.[3]

**CONCLUSION**

For the foregoing reasons, the opinion below should be reversed in full.

Dated: April 13, 2022

Respectfully submitted,

/S/ CALVITA J. FREDERICK
Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001
*Attorney for Plaintiff-Appellant*

---

[3] This is especially so, given the particularities of Section 1981.  Unlike Title VII, which only imposes liability on an "employer," Section 1981 creates "an independent basis for liability against individuals for their interference with contractual relationships." *Patel v. Bd. of Governors of State Colls. & Univs.*, Case No. 92 C 8300, 1997 U.S. Dist. LEXIS 10221, at *8-9 (N.D. Ill. July 8, 1997).

**CERTIFICATE OF COMPLIANCE WITH FRAP RULE 32(a)(7), FRAP RULE 32(g) and CR 32(c)**

The undersigned, counsel of record for the Plaintiff-Appellant, Nicole Bronson, furnishes

the following in compliance with F.R.A.P Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P Rule 32(a)(7)

for a brief produced with a proportionally spaced font. The length of this brief is 5,035 words.

Dated: April 13, 2022

/S/ CALVITA J. FREDERICK
Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001
*Attorney for Plaintiff-Appellant*

**PROOF OF SERVICE**

The undersigned, counsel for the Plaintiff-Appellant, Nicole Bronson, hereby certifies

that on April 13, 2022, she caused the Brief and Appendix to be served on opposing counsel via

ECF.

/S/ CALVITA J. FREDERICK
Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001
*Attorney for Plaintiff-Appellant*

## **RULE 30(d) STATEMENT**

Per Circuit Rule 30(d), Appellants' brief contains all of the materials required by Federal Rules of Appellate Procedure 30 and Local Rule 30.  The materials are attached to the Special Appendix and to a separate appendix filed herewith.

Dated: April 13, 2022

/S/ CALVITA J. FREDERICK
Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001
*Attorney for Plaintiff-Appellant*

**SHORT APPENDIX**

Memorandum Opinion and Order (March 18, 2021)……………………………………………1
Order (January 25, 2022) …………………………………………………………………………17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE M. BRONSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 2077 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| ANN & ROBERT H. LURIE | ) | |
| CHILDREN'S HOSPITAL OF | ) | |
| CHICAGO, an Illinois NFP | ) | |
| Corporation, and SUSAN | ) | |
| RUOHONEN, in her | ) | |
| Individual Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Nicole Bronson, a Black teacher for Chicago Public Schools ("CPS"), has been assigned to work as a Citywide Hospital and Treatment Center Teacher at Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie") since 2018. Bronson alleges that Lurie and its Senior Director of Family Services Susan Ruohonen (collectively, "Defendants") have subjected her to discrimination and harassment on the basis of her race during her assignment, thereby violating her rights under Title VII, 42 U.S.C. § 1981, and Illinois state law. Now before the Court is Defendants' motion to dismiss the complaint with prejudice. For the reasons that follow, the motion is granted, except insofar as the Court dismisses Count III without prejudice after relinquishing supplemental jurisdiction over it.

1

## I.    Background[1]

Bronson is and was at all relevant times a teacher under contract with CPS and a member of the Chicago Teachers Union ("the CTU").  *See* Compl. ¶¶ 9, 27–29, 102–03, ECF No. 1.  In August 2018, she was assigned by her CPS supervisor, Tora Evans, to work as a Citywide Hospital and Treatment Center Teacher on site at Lurie for three years.  *Id.* ¶ 9; *see also id.* ¶ 29.  In this position, Bronson provides instruction to students who are unable to access classroom instruction due to a diagnosed medical or psychiatric condition.  *Id.* ¶ 12.  In addition to Bronson, two other CPS teachers filled the same position at Lurie during Bronson's tenure: Barbara Lee, who is white, and Catherine Cooper, who is Black.  *Id.* ¶ 14.  Ruohonen, who is Lurie's Senior Director of Family Services, serves as the teachers' "representative supervisor" at the hospital.  *Id.* ¶¶ 3, 29; *see also id.* ¶ 11 (calling her an "immediate supervisor").

Bronson alleges that, from the start of her assignment at Lurie, Ruohonen treated her and Cooper—the first Black CPS teachers ever to occupy their position, *id.* ¶ 15—differently than Lee and other CPS teachers served in that position, *id.* ¶ 16.  This allegedly discriminatory treatment began right from the beginning, when neither Bronson nor Cooper were given access to Lurie's electronic medical records system, called "EPIC."  *See id.* ¶¶ 14, 17–20.  When Bronson asked Ruohonen why she and Cooper—unlike every other CPS teacher who had come before them—did not have access to EPIC, Ruohonen said that it was due to a new policy at Lurie meant to prevent violations of the Health Insurance Portability and Accountability Act

---

[1]    The Court "accept[s] as true all well-pleaded facts alleged" in reviewing a motion to dismiss.  *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

("HIPAA").  But Bronson and Cooper were the only teachers without access to EPIC, *id*. ¶¶ 19, 23–24, and that lack of access makes it more time-consuming for Bronson and Cooper to obtain medical information needed to prepare a student's course of instruction.  *Id.* ¶ 25.

Bronson claims that, after she questioned her lack of access to EPIC, Ruohonen subjected her to an increasing amount of harassing conduct.  *Id.* ¶ 26.  For instance, on February 26, 2019, Ruohonen emailed Evans with a list of complaints about Bronson and Cooper, including allegations that "[t]heir attitudes do not reflect our culture here" and they were "[n]ot really committed to their service of our patients." *Id.* ¶ 28.  In response, a CTU representative, Leah Raffanti, told Ruohonen that her allegations were "contemptuous" and "insulting," and that her attempt to provide "feedback" was not well received.  *Id.* ¶ 29.  Raffanti also advised Ruohonen that, under the collective bargaining agreement (the "CBA") entered into between CPS and the CTU, which governed the terms of CTU members' employment, "[t]he only person" who could initiate discipline against a member, terminate a member, or even evaluate a member's work performance was "their [CPS] supervisor"—in this case, Evans.  *See id.*  As a further result of Ruohonen's email, the CTU removed her as Bronson and Cooper's representative supervisor.  *Id.*

On another occasion, Bronson was interrupted during an appointment with one of her students by a nurse who asked her, in front of the student and the student's grandmother, whether she could read.  *Id.* ¶ 33.  On yet another occasion, in April 2019, Ruohonen humiliated Bronson and Cooper by suddenly excusing herself from

taking a picture with them during a photoshoot for Teacher's Appreciation Week. *Id.*
¶ 38. Bronson and Cooper also initially received identification badges from Lurie that
were in different colors than those of other CPS teachers. *Id.* ¶ 30.

In May 2019, Ruohonen sent an email to Evans informing her that, due to
organizational changes at Lurie, CPS teachers would have their office space relocated
from its location on the 19th floor to a location on the 12th floor that was shared with
Family Services and hospital interns. *Id.* ¶ 39. In response, Evans insisted to
Ruohonen that, pursuant to the terms of the CBA, all CPS teachers were entitled to
"adequate workspace," including "at a minimum a desk, chair, access to a computer,
working copiers, printers and telephones." *Id.* ¶ 41. Evans raised this topic in a
meeting with the teachers at the start of the next school year, in August, stating that
CPS's site administrators had all agreed that the new workspaces "were adequate
and appropriate" and asking the teachers to "inform her immediately if they
discovered their work site was inadequate." *Id.* ¶ 42. Upon arriving at Lurie,
however, Bronson found that Lurie had provided only two desk spaces for all three
teachers and that one of the desks had already been reserved for Lee, even though
she arrived to work last. This left Bronson and Cooper to share the remaining desk
space. *See id.* ¶¶ 40, 43. Instead of raising the issue with Evans, however, Bronson
"made do with what she was provided." *See id.* ¶ 46.

In a conference call on October 3, 2019, Evans informed the teachers that
Ruohonen had requested one of them to be reassigned to another hospital due to the
reduced workspace at Lurie and asking for a volunteer. *Id.* ¶ 45. While expressing

4

to Evans that space "was no longer an issue," Bronson said she would volunteer if doing so "would stop [Ruohonen] from harassing her." *Id.* ¶¶ 46–47. In response, Evans added that Ruohonen had said she was drafting a HIPAA complaint against Bronson and wanted it to be placed in Bronson's personnel file; Bronson denied committing a HIPAA violation. *Id.* ¶¶ 48–49.

The teachers met to discuss the conference call amongst themselves later that day. In the end, they had Lee email Evans on behalf of all three to say that Lurie "definitely needs to have three CPS Hospital teachers on-site" and to confirm that the workspace issues "have been resolved." *Id.* ¶ 51. Bronson continues to be assigned to Lurie.

Bronson filed this case after receiving a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission in December 2019. *Id.* ¶ 53. Her complaint brings five counts. Count I alleges that Defendants subjected Bronson to a hostile work environment, in violation of Title VII. *Id.* ¶¶ 55–63. Count II alleges that Defendants discriminated against Bronson on the basis of her race, also in violation of Title VII. *Id.* ¶¶ 64–68. Count IV alleges racial discrimination as well, this time in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 74–98. Count III alleges that Defendants defamed Bronson by reporting false information to CPS, including with regard to the HIPAA complaint. *Id.* ¶¶ 69–73. Count V alleges that Defendants tortiously interfered with Bronson's employment contract with CPS. *Id.* ¶¶ 100–06.

Defendants' motion to dismiss the complaint with prejudice is now before the Court. *See* Defs.' Mot. Dismiss ("Mot."), ECF No. 16.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Moreover, while courts "must take all of the factual allegations in the complaint as true" for purposes of a motion to dismiss, they are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

## III.    Analysis

Defendants raise a host of arguments for dismissing Bronson's complaint in its entirety. The Court begins with Bronson's federal claims, then turns to her state law claims.

A.    **Title VII (Counts I and II)**

Defendants argue that Bronson's Title VII claims must be dismissed because Lurie is not her employer. Tacitly conceding that Lurie is not her *direct* employer, Bronson counters that it can be held liable as her *de facto* employer.

The threshold element of any Title VII claim is "the existence of an employer-employee relationship." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Although Title VII claims are typically asserted against an employee's "direct" employer, it is "well established in this circuit" that a plaintiff "may have multiple employers for purposes of Title VII liability," and may, "under certain limited circumstances, bring a claim against a defendant who is not his direct employer." *Id.* (citing *Tamayo*, 526 F.3d at 1088; *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995)).[2]

The Seventh Circuit uses a five-factor test to determine whether a defendant is a "*de facto* or indirect employer." *Id.* at 701–02 (cleaned up); *see Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). These factors are:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Love*, 779 F.3d at 702 (citing *Knight*, 950 F.2d at 378–79).

---

[2]    It is also well established in this circuit "that a supervisor does not, in his individual capacity, fall within Title VII's definition of employer." *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998) (cleaned up). Thus, to the extent Counts I and II are brought against Ruohonen in her individual capacity, they are dismissed with prejudice.

In examining these factors, the Court must consider "both how much control [Lurie] exerted over [Bronson], and also what the economic realities of their relationship were." *Id.* (clarifying that the *Knight* factors are "an operationalization of the 'economic realties' test" attributed to *EEOC*, as opposed to a separate test). The Seventh Circuit has stressed that "the employer's right to control is the 'most important' consideration in ascertaining the existence of an employer-employee relationship." *Id.* at 703 (quoting *Knight*, 950 F.2d at 378). "Thus, if an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (Feb. 7, 1997) (cleaned up). The court also has emphasized that, "when control is examined, 'the key powers are, naturally, those of hiring and firing.'" *Love*, 779 F.3d at 703 (quoting *EEOC*, 69 F.3d at 171).

Bronson relies on the following allegations to show that Lurie was her *de facto* employer: (1) that she was assigned to work on-site at Lurie for three years, Compl. ¶ 9; (2) that Lurie required her to complete unspecified hospital "training," carry a hospital identification badge and a hospital pager, and use a hospital email account, *id.* ¶ 10; (3) that Lurie controlled instruments and tools relevant to her position, like its EPIC medical records system, although Bronson did not have access to it, *id.* ¶ 18; (4) that Ruohonen was her immediate supervisor at the hospital, *id.* ¶ 11; (5) that Bronson was bound by hospital policies, especially those pertaining to HIPAA rules,

and had to undergo HIPAA training, *see id.* ¶¶ 19, 35; (6) that Lurie provided her (or failed to provide her) with adequate workspace, *see id.* ¶ 39; (7) that Ruohonen attempted to have one of the teachers reassigned to another hospital, *id.* ¶ 45;[3] and (8) that Ruohonen attempted to have a HIPAA complaint placed in her personnel file.

These allegations fall short of establishing that Defendants were Bronson's *de facto* employer. For starters, none of them establish the sort of control that the Seventh Circuit has emphasized: the ability to hire, fire, or direct an employee's work. *See Love*, 779 F.3d at 703. To the contrary, Bronson concedes that it was CPS who hired her, CPS who assigned her to a three-year stint at Lurie, and CPS alone who could fire or even discipline her. *See* Compl. ¶¶ 9, 29. Moreover, Bronson's allegation that only CPS could evaluate her work, and that even Ruohonen's attempt to provide constructive "feedback" was not "received well" by the CTU, *see id.* ¶ 29, bolsters the conclusion that Lurie had no right to direct Bronson's work, neither "as to the result to be achieved" nor "as to the detailed by which that result is achieved," *see Alexander*, 101 F.3d at 493. And, although Bronson highlights that Ruohonen *attempted* to have CPS reassign a teacher to another facility and *attempted* to have CPS initiate discipline against Bronson, these allegations merely underscore that Lurie lacked "the key powers" of control over her and the other on-site CPS teachers. *See EEOC*, 69 F.3d at 171.

---

[3]     Although Bronson contends that Ruohonen specifically sought to have *her* reassigned to another hospital, the allegations show that she merely presumed that to be the case given their history. *See* Compl. ¶¶ 45, 47.

Furthermore, Bronson overstates the minor measures of control or supervision she does ascribe to Lurie.  For instance, although Bronson alleges that Ruohonen was her "immediate supervisor" at the hospital, Compl. ¶ 10, the CTU characterized her as Bronson's "representative supervisor"—suggesting that she *represented* a non-employer—while referring to Evans as Bronson's *true* "supervisor"—the one with sole power to evaluate, discipline, reassign, and terminate, *see id.* ¶ 29.  That the CTU readily removed Ruohonen as Bronson's representative supervisor as a result of her February 26, 2019 email, further demonstrates Lurie's lack of meaningful supervision or control over Bronson.  *See id.*

In addition, while Lurie necessarily exercised some control over the teachers' workspace (the teachers were stationed there after all), even that control was minimized by the oversight of Evans, who ensured that the new workspaces were found to be "adequate and appropriate" by CPS's site administrators. *See id.* ¶¶ 41–42.  As for Lurie's control over EPIC, that Bronson was *denied* access under the hospital's new HIPAA policy underscores the extent to which she was not treated like a hospital employee.  As to the remainder of the allegations on which Bronson relies, they are consistent with the kind of security procedures that any hospital would require of on-site workers, regardless of employment status.

Bronson likewise fails to show that the other *Knight* factors, which go to the "economic realities" of the relationship, demonstrate that Lurie was her *de facto* employer.  *See Love*, 779 F.3d at 702–03.  She does not allege that Lurie helped her to acquire skills for her job, that Lurie was responsible for any of the costs of

operation, or that Lurie had anything to do with the method or form of her payments or benefits.    And although the length of Bronson's assignment at Lurie was substantial, the more salient point is the Lurie had no control over the terms of her assignment and no power of its own to reassign her or any other CPS teacher.

In sum, the complaint fails to indicate that Lurie was Bronson's *de facto* or indirect employer for purposes of Title VII.   And given the affirmative allegations in the complaint that established that CPS alone held all of "the key powers" of control and supervision, *see EEOC*, 69 F.3d at 171, the Court does not believe that Bronson could fare better in an amended complaint.   Accordingly Counts I and II are dismissed with prejudice.   *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("Leave to amend need not be granted . . . if it is clear that any amendment would be futile.").

## B.    42 U.S.C. § 1981 (Count IV)

Bronson's other federal claim arises under § 1981, which grants "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts," among other activities.  42 U.S.C. § 1981(a). For purposes of this provision, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."   *Id.* § 1981(b).   To state a claim under § 1981, a plaintiff must show (1) that she is a member of a racial minority, (2) that the defendant had an intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the

activities enumerated in the statute—here, the making and enforcing of a contract. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

Defendants argue that Bronson fails to satisfy the third element of a § 1981 claim because she cannot show that any alleged discrimination interfered with her right to make or enforce contracts.  In Bronson's view, she has sufficiently alleged that Defendants interfered with her right to adequate workspace under the terms of the CBA between CPS and CTU because of her race, before the start of the 2019 school year.  *See* Compl. ¶¶ 41, 97, 102–04.

The Seventh Circuit has recognized that "a third party's interference" with a plaintiff's right to make or enforce a contract with another can support a claim under § 1981.  *Shaikh v. City of Chi.*, 341 F.3d 627, 630 (7th Cir. 2003) (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (holding that the right to lease under 42 U.S.C. § 1982, which courts have interpreted in tandem with § 1981,  "is protected . . . against the actions of third parties, as well as against the actions of the immediate lessor"); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) (reading *Sullivan* to encompass "a third party's interference with th[e] rights guaranteed under Section 1981")).  While *Shaikh* derived this rule from *Sullivan*, the court noted that *Sullivan* "did not discuss what type of action it anticipated would constitute third-party interference."  *Id.* at 630–31.  However, recognizing that "the concept of third-party interference with contractual or business relationships . . . is a well-recognized common-law tort," the court turned to Illinois law (which governed the state law issues in that case) and asked whether the plaintiff had sufficiently alleged

tortious interference for purposes of § 1981. *Id.* at 631–32 (finding that he had not); *see also Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (reiterating in dicta "that tortious interference with contract rights violates section 1981 when the motivation for the interference is racial").

Here, however, Bronson has not adequately alleged that Defendants tortiously interfered with her contractual right to adequate workspace under the CBA. "To state a cause of action for tortious interference with a contractual relationship, a plaintiff must establish (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages. *Complete Conference Coordinators, Inc. v. Kumon N. Am., Inc.*, 915 N.E.2d 88, 93 (Ill. App. Ct. 2009). What is missing here is the allegation that Defendants induced a party to the CBA—namely CPS—to breach the provision entitling Bronson to adequate workspace. *Cf. Mitchell v. Weiger*, 409 N.E.2d 38, 41 (Ill. App. Ct. 1980) (noting that "inducement to breach contract involves acts aimed at parties other than a plaintiff"). To the contrary, Bronson's theory is that Defendants themselves failed to abide by that provision, even though they were not parties to the CBA.[4]

---

[4]    Although Bronson's response brief does not mention them, the complaint also asserts that, by taking "many" other alleged discriminatory acts, such as Ruohonen's efforts to have her disciplined by CPS, Defendants "attempted to induce CPS" to breach Bronson's rights under the CBA. *See* Compl. ¶ 105. Because an attempt to induce a breach of contract is not sufficient to state a claim of tortious interference under Illinois law, these allegations do not support Bronson's § 1981 claim. *See Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, No. 15 C 06811, 2016 WL 5405107, at *13 (N.D. Ill. Sept. 28, 2016). As for Bronson's argument that Defendants' actions rendered performance of her employment contract "impossible," the

Even assuming *arguendo* that interference with a contractual relationship means something broader for purposes of § 1981 than for purposes of Illinois common law, the complaint still fails to state a claim.  Notably, Bronson's workspace complaints ignore the fact (which Bronson concedes) that Evans sent an email to Ruohonen on behalf of the teachers to vindicate their contractual right to "adequate workspace" ahead of the 2019 school year, Compl. ¶ 41, and that, as a result, the site administrators all certified in writing to her and the CTU that the new workspaces "were adequate and appropriate," *id.* ¶ 42.  And while Bronson now maintains that Defendants nonetheless failed to provide her with an adequate workspace, she not only declined Evans's invitation to raise that issue with her, *see id.*, but expressed to Evans "that space was no longer an issue" during their October 3, 2019, conference call.  *Id.* ¶ 46; *see also id.* ¶ 51 (reiterating Bronson's agreement "that the workspace . . . issues have been resolved," except for one issue not raised in this suit).  Given this, it is difficult to see how Bronson can claim that Defendants prevented her from enforcing her right to adequate workspace.

Accordingly, the complaint fails to establish a violation of § 1981.  And because the Court finds that any amendment of the claim would be futile, Count IV is dismissed with prejudice as well.[5]  *See Bogie*, 705 F.3d at 608.

---

factual allegations in the complaint fall short of indicating that this was the case. *See* Compl. ¶ 104; *cf. George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330 31 (7th Cir. 1983) (recognizing that "rendering performance impossible," as opposed to merely rendering it more burdensome, can satisfy the breach element of tortious interference under Illinois law).

[5]     Because the Court has dismissed Bronson's federal claims with prejudice for the reasons given above, it need not address Defendants' remaining arguments on these claims.

## C.    State Law Claims (Counts III and V)

That leaves Bronson's state law claims of defamation and tortious interference with contract.  Defendants argue that the complaint fails to state these claims as well.  Since the Court has dismissed Bronson's federal claims with prejudice, however, "the usual practice" would be to relinquish supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3) and dismiss them without prejudice.  *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

That said, this case presents an unusual circumstance warranting the exercise of supplemental jurisdiction over one of Bronson's state law claims.  *Cf. Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001) (reviewing "exceptions to th[e] general rule").  The Seventh Circuit has held "that when 'the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim[,] there is no use leaving the latter to state court.'"  *Id.* at 731 (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)).  And here, in dismissing Bronson's § 1981 claim, the Court necessarily found that Bronson cannot state a claim of tortious interference under Illinois law because the complaint shows that Defendants did not induce any breach of contract, as discussed above.  Thus, because "federal-state comity is certainly not served by sending back to state court doomed litigation that will only be dismissed once its gets there," the Court dismisses Count V with prejudice.  *See Groce*, 193 F.3d at 502 (cleaned up).  Count III does not suffer from the same deficiency and, thus, it is dismissed without prejudice for lack of supplemental jurisdiction under § 1367(c)(3).

## IV.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.  Bronson's federal claims (Counts I, II, and IV), as well as her tortious interference claim (Count V), are dismissed with prejudice, while her defamation claim (Counts III) is dismissed without prejudice for lack of jurisdiction.  Judgment will be entered accordingly in favor of Defendants.  This case is terminated.

**IT IS SO ORDERED.**                    **ENTERED    3/18/21**

_____

**John Z. Lee**
**United States District Judge**

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE M. BRONSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 2077 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| ANN & ROBERT H. LURIE | ) | |
| CHILDREN'S HOSPITAL OF | ) | |
| CHICAGO, an Illinois NFP | ) | |
| Corporation, and SUSAN | ) | |
| RUOHONEN, in her | ) | |
| Individual Capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons set forth below, Plaintiff Nicole Bronson's motion to reconsider the Court's memorandum opinion and order of March 18, 2021, dismissing her complaint and closing this case [33] is denied. This case remains closed.

## STATEMENT

Bronson is a Citywide Hospital and Treatment Center Teacher under contract with Chicago Public Schools ("CPS") and assigned by CPS to a three-year position on-site at Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie"). She filed this action against Lurie and its Senior Director of Family Services Susan Ruohonen (collectively, "Defendants") in March 2020, asserting five counts: (I) hostile work environment under Title VII; (II) race discrimination under Title VII; (III) defamation under Illinois law; (IV) race discrimination under 42 U.S.C. § 1981; and (V) tortious interference with contract under Illinois law. *See* Compl. ¶¶ 55–106, ECF No. 2.

17

By order dated March 18, 2021, the Court granted Defendants' motion to dismiss the complaint with prejudice as to all but Count III, over which the Court relinquished supplemental jurisdiction under 28 U.S.C. § 1367(c)(3). As to Bronson's Title VII claims, the Court found that the allegations fell short of establishing that Lurie was her joint (*i.e.*, *de facto* or indirect) employer under the multi-factor test of *Knight v. United Farm Bureau Mutual Insurance Co.*, 950 F.2d 377 (7th Cir. 1991). *Id.* at 7–11. As to her § 1981 claim, the Court concluded that the complaint failed to establish any interference, including third-party interference, with Bronson's right to make or enforce contracts. *Id.* at 11–14. For the same reason, the Court dismissed Bronson's tortious interference claim with prejudice as well. *Id.* at 15.

Bronson moves the Court to reconsider that decision. *See* Pl.'s Mot. Reconsider, ECF No. 33. A motion to reconsider serves "a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) (cleaned up). As such, a motion to reconsider "performs a valuable function where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (cleaned up). But a motion to reconsider is not "an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale*, 90 F.3d at 1270.

Rehashing previously rejected arguments is all that Bronson does with respect to her Title VII claims. Simply put, the Court has already explained why it rejected her argument that the complaint "includes sufficient allegations to state a plausible claim that [Lurie] was a 'joint employer' for purposes of Title VII." Pl.'s Mem. Supp. Mot. Reconsider ("Mem.") at 3, ECF No. 34. In a word, the allegations affirmatively reveal that Lurie "lacked 'the key powers' of control" over her employment. 3/18/21 Mem. Op. and Order at 9, ECF No. 32 (quoting *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995)). Bronson's reiteration that this is a "fact-intensive" issue does not change the outcome in light of such allegations. *See Penteris v. Citgo Petroleum Corp.*, 104 F.Supp.3d 894, 900 (N.D. Ill. 2015). In *Penteris*, for instance, on which she relies, the court denied a motion to dismiss because the complaint allowed the reasonable inference that the defendant "exercised control over . . . employment decisions" and may have terminated the plaintiff. *See id.* Since the allegations here defeat any such inference, "further development through discovery" is not warranted. *See id.*

Bronson fares no better with regard to her § 1981 claim. Relying on *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016), Bronson argues that she "has sufficiently alleged damage to her career from Lurie's discriminatory conduct" to allege a violation of that statute. Mem. at 6. This argument misunderstands the Court's decision. The cited language in *Boss* concerns the element of "a materially adverse employment action" for purposes of a Title VII discrimination claim. *See* 816 F.3d at 917–18. By contrast, the Court dismissed Bronson's § 1981 claim because the complaint failed to allege that any of Lurie's discrimination interfered with her right "to make or enforce

contracts," an altogether different inquiry. *See* 42 U.S.C. § 1981(a). In so doing, the Court properly considered an email that the complaint alleges Bronson's co-worker sent "on behalf of all 3 CPS Teachers" assigned to work at Lurie. *See* Compl. ¶ 51. But the Court did not, as Bronson contends, mischaracterize her as the *author* of that email; it simply drew the only reasonable inference it allowed, that Bronson *agreed* with its author "that the workspace and storage issues" underlying her § 1981 claim had been resolved. *See id.* Indeed, as the Court also noted, the complaint elsewhere alleges that Bronson herself told their union representative the same thing earlier that day. *See id.* ¶ 46. And given Bronson's concession that the Court did not err in finding no allegation of tortious interference, which the Court found to be central to her ability to show third-party interference with a contract for purposes of her § 1981 claim, it follows that the Court properly dismissed that claim as well.

Lastly, Bronson asks for leave to file an amended complaint, citing "newly-discovered evidence" in the form of "information and belief" that "the entire department" to which she is assigned "is being terminated at the end of the school year and must re-apply." Mem. at 10. As an initial matter, the Court does not understand Bronson to assert that Lurie, as opposed to CPS, has decided to terminate or reassign her, especially as that would contradict that allegations of the complaint. *See* Compl. ¶ 29. In any event, it is difficult to see how a decision to terminate or reassign all three CPS teachers, one of whom is white, constitutes evidence of race discrimination. *Id.* ¶ 14. Finally, even assuming that this development gives rise to any claim at all, Bronson remains free to assert it in a new case.

Accordingly, Bronson's motion to reconsider is denied.


**IT IS SO ORDERED.**                    **ENTERED: 1/25/22**

_____
**John Z. Lee**
**United States District Judge**